IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KATHERINE M. MCWHORTER,

        Plaintiff,

vs.                                No.  07cv0646 DJS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (McWhorter's) Motion to Remand for a Rehearing **[Doc. No. 18]**, filed November 20,2007, and fully briefed on January 16, 2008.  On July 19, 2006, the Commissioner of Social Security issued a final decision denying McWhorter's claim for disability insurance benefits and supplemental security income.  McWhorter seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is not well taken and will be DENIED.

### I.  Factual and Procedural Background

McWhorter, now fifty-one years old (D.O.B. November 27, 1956), filed her application for disability insurance benefits and supplemental security income on October 21, 2004 (Tr. 21), alleging disability since February 24, 1999 (Tr. 411), due to musculoskeletal pain, vision problems, depression and post-traumatic stress disorder.  Tr. 22.  McWhorter has a high school

education and two years of college education (Tr. 21) and past relevant work as a waitress, busser, dishwasher, bartender, hostess and secretary.

On July 19, 2006, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding McWhorter "retain[ed] the residual functional capacity (RFC) to perform her past relevant work as a secretary, both as she performed this job in the past and as it is generally performed in the national economy." Tr. 27. Additionally, the ALJ further found that, "even if the claimant were precluded from all of her past relevant work, there are other jobs, existing in significant numbers in both the national and regional economy, to which the claimant could make a successful vocational adjustment." Tr. 27. Moreover, the ALJ found McWhorter's "allegations regarding her limitations [were] not totally credible." Tr. 28.

McWhorter filed a Request for Review of the decision by the Appeals Council. On November 9, 2006, the Appeals Council denied McWhorter's request for review of the ALJ's decision. Tr. 13. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. McWhorter seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must

meticulously examine the record as a whole, including anything that may undercut or detract from

the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington*

*v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

Finally, "[t]he possibility of drawing two inconsistent conclusions from the evidence does

not prevent an administrative agency's findings from being supported by substantial evidence.

[The court] may not displace the agency's choice between two fairly conflicting views, even

though the court would justifiably have made a different choice had the matter been before it de

novo." *Lax v. Astrue*, 489 F.3d 1080,1084 (10th Cir. 2007) (citations, quotations, and brackets

omitted).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a

claimant must establish a severe physical or mental impairment expected to result in death or last

for a continuous period of twelve months which prevents the claimant from engaging in

3

substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand, McWhorter makes the following arguments: (1) the ALJ failed to advise her adequately of her right to counsel; (2) the ALJ erred when he found she did not have a severe mental impairment and erred when he failed to develop the record regarding her mental impairment; (3) the ALJ's RFC determination is not supported by substantial evidence; (4) the ALJ improperly adopted the vocational expert's (VE) testimony; and (5) the ALJ's credibility finding is not supported by substantial evidence.  The Court will first address the ALJ's credibility finding as it impacts some of McWhorter's other arguments.

4

## A.  Credibility Determination

"Because '[e]xaggerating symptoms or falsifying information for purposes of obtaining government benefits is not a matter taken lightly by this Court,' we generally treat credibility determinations made by an ALJ as binding upon review."   *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir.1988) (quoting Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir.1983).  Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  "Standard boilerplate language will not suffice."  *Briggs ex rel. Briggs*, 248 F.3d 1235, 1239 (10th Cir. 2001).

In his decision, the ALJ noted:

> I have also considered the opinions of the physicians and psychologists who reviewed the record on behalf of the Disability Determination Service at the initial and reconsideration levels, in accordance with 20 C.F.R. §§ 404.1527 and 416.927 and Social Security Ruling 96-6p (Exhibits 6F, 12F).  These experts concluded that the claimant remained capable of work at the light exertional level and that the objective record did not support her allegations to the extent alleged.  Specifically, it was noted that the claimant was capable of housekeeping, doing her laundry, caring for her pets, walking up to 1 ½  miles, using a telephone and computer, doing crossword puzzles and caring for her personal needs.  There is no medical evidence in the form of treating physicians reports or objective diagnostic studies contradicting these findings. No medical source has opined that the claimant is more restricted in her ability to function than is expressed in these reports.  I therefore accord determinative weight to the findings of the state agency consultants who reviewed the record on behalf of the Disability Determination Service.

> Accordingly, I find that the claimant retains the following residual functional capacity: to lift and carry up to ten pounds frequently and twenty pounds occasionally; and to sit, stand and walk at least six hours each in an average eight-hour day.  She is limited to occasional ladder climbing and scaffold use, as well as the performance of other postural activities such as bending and stooping.  She should be limited to work environments where she could alternate sitting and standing or change positions as needed and should only occasionally perform overhead reaching with her upper extremities.  In so finding, I note that I have also considered

the claimant's statements made at the hearing and in disability reports submitted in conjunction with her application, as well as any statements made by third persons on her behalf.  Specifically, I have reviewed her statements concerning her daily activities; the location, duration, frequency, and intensity of her pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, for relief; any other measures used for relief; and other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (20 CFR §§ 404.1529 and 416.929 and Social Security Ruling 96-7p).  <u>I do not find these statements credible because they are not supported by the objective medical evidence submitted in support of her application.</u>  The claimant states that, at the time she fell out of her trailer and fractured her left wrist, she also injured her shoulders and suffered what she call "quadruple whiplash."  <u>There is absolutely no mention of any injury to the claimant's neck or shoulders at the time of this incident, nor is there any diagnosis of "quadruple whiplash."  She also alleges that she takes a long time to recuperate, but the treatment records from Dr. Down and Joan Price, PA-C at Greentree Orthopedics, indicate that she healed without any delay or complication after her wrist fracture and in fact she declined a splint after her cast was removed.  The claimant states that she can hardly walk and has great difficulty concentrating, but there are no such allegations in the record and no findings on physical or psychological evaluation which would explain these difficulties.  She uses a cane, but this has never been prescribed by any of her medical providers.  She states that it helps her stand up straight, but on all examinations, she has been found to be very flexible, with normal strength, sensation, reflexes and range of motion.  The claimant made other vague references to the presence of toxins in her drinking water which were making her "bleed" and that she has many allergies which also affect her level of functioning.  **The great majority of the claimant's allegations are just that– bare assertions, without any corroboration or support in the record**.  Moreover, almost every treating or examining source has referenced the claimant's histrionic nature and amplification of symptoms.</u>  For these reasons, I find that she is not fully credible and there is no basis upon which to find her more limited.

Tr. 25-26 (emphasis added).

The ALJ affirmatively linked his credibility finding to substantial evidence and will not be disturbed.  The record shows that on January 4, 2005, McWhorter reported she could walk one hour a day, tried to go somewhere once a week by herself, and regularly went dancing ("try to go dancing each week") when she could find a ride.  Tr. 112-116.  McWhorter also reported she handled stress well and coped effectively, handled changes in routine "very well," had difficulty

6

with depression "at times" and submitted a two page "Daily Routine" memorandum.  Tr. 118-

121.[1]

----

[1]  The January 25, 2005 Daily Routine memorandum states in relevant part:

I wake up early, but usually stay in bed dozing for about an hour reviewing and analyzing my dreams.
When I get up, I take the dog out (small, he's a Chihahua), start coffee, turn on the local news, and have a
couple hits of tobacco.  I feed the dog and cats while waiting for the house to warm up.

After the house is warm enough, I prepare for my rehab/workout.  I take my meds: probiotics, thyroid, flax
oil, estrogen, kidney/bladder booster, and shepphards purse with at least 16 ounces of water.  Then I get
out the clothes, weights, boxes, tapes, etc. to do aerobic weight-lifting videos.  The tapes are 45 minutes to
1 hour.  This usually takes about 1 ½ to 3 hours.  At this point, I can lift 1-3 pounds during the workout.
Right now, I can do my workout every other day.  I've tried every day, but I relapse.  The pain is
excruciating all night long when I relapse.  Then I have to skip two days, at least.

After my workout, I take a shower.  After the shower, I rub down with a combination of coconut and
vitamin E oils.  I try to dress like I will actually get to meet and talk with someone each day.

Once I'm clean, dry, and dressed from my shower, I set up my impedence device.  It takes 20 minutes on
ice before I can use it.  Once I hook it up, I read something spiritually uplifting and connecting for the 30
minutes of passive therapy.

By now it is around 1 or 2 pm.  I put on protective outer clothes, put a leash on the dog, and go for a walk.
I walk about 1/4 of a mile from my house.  There is a big steep hill there.  My dog, Freddy, and I climb up
it then down it to the river.  There is a big grassy field there and we play fetch for about an hour, then we
climb out and walk back home.

When we get home, I fix something to eat.  Then I rest.  I usually need a nap.
The rest of the evening, I read, watch TV, work crosswords, answer online mail, and play solitaire on the
computer or with real cards.  Most night, I only eat "nibble" food: walnuts, popcorn, fish sticks, a cup of
soup, etc. – anything without sugar.  Sugar aggravates Candida Albans.

At least 3 nights a week, I spend at least 1 hour on dance.  Usually once a week, but not always, my
daughter will come by, pick me up, and take me dancing somewhere there are people for an hour.

Before bed, I take my calcium (morning coffee binds the calcium, evening calcium is restful), meditate, and
play subliminal health tape.

Tr. 120-121.

**C.  Denial of Due Process**

McWhorter contends the ALJ denied her due process because "she did not understand there would be issues that required someone familiar with at least the rudimentary basics of Social Security Law to assist her . . . ."  Pl.'s Mem. in Support of Mot. to Reverse at 4.  The Court disagrees.

The Court of Appeals for the Tenth Circuit addressed this issue in *Carter v. Chater*, 73 F.3d 1019 (10th Cir. 1996), stating:

> Ms. Carter argues that the ALJ failed to advise her adequately of her right to counsel.  The record reveals, however, that the ALJ did advise Ms. Carter of her right to counsel prior to the hearing, and that she waived that right.  The notice of hearing, notice of denial, and notice of reconsideration sent to Ms. Carter also advised her of her right to representation.  While the customary and better practice would seem to be to place both the advisement and the waiver on the record during the hearing, neither the pertinent statute, *see* 42 U.S.C. §406(c), nor the regulations, *see* 20 C.F.R. §404.1706, nor our previous cases require any more advisement than was given in this case.

*Id.* at 1021 (citations to record omitted).

In this case, the record indicates the agency advised McWhorter of her right to representation on more than one occasion.  *See* Tr. 43-44 (April 27, 2005 Notice of Disapproved Claim/Disability Insurance claim); Tr. 38-39 (Notice of Reconsideration/Disability Insurance claim); Tr. 49-50 (January 27, 2006 Notice of Hearing); Tr. 418-420 (Notice of Disapproved Claim/SSI claim); Tr. 424-425 (Notice of Reconsideration/SSI claim).  At the administrative hearing, the ALJ again advised McWhorter of her right to representation.  The following colloquy took place:

ALJ:   I'm Judge Stewart.  I'm an Administrative Law Judge.  We're here for a hearing on the issue of disability.  This is Ms. Jones.  She's a vocational expert.  She'll be testifying as a

witness.  The first thing I need to let you know about is that you have a right to have – be

represented by an attorney or other representative.  Do you understand that?

Ans:    Yes, sir.

ALJ:    Do you want to go ahead with the hearing today without that kind of representation?

Ans:    Yes, sir.  They informed me that these proceedings were not adversarial.

ALJ:    Uh-huh.  That's right.  Okay.  Do you have any questions for me about the hearing or

about Social Security or disability or anything?

Ans:    I don't know enough to ask a question.

ALJ:    All right.  Well, let me just give you a little additional information.  A decision about

disability takes five steps.  First, if the person is working and earning a living, then that

person would be found not disabled.  Secondly, if the person doesn't have a medical

condition that limits the ability to work, then that person would be found not disabled.

Third, there are listing of impairments.  Those are described at a level of severity that

would preclude any kind of gainful activity and, if a person has something like that, the

person would be found disabled.  If that's not the case, then the focus shifts to vocational

issues.  The fourth question is whether the individual could go back and do work she did

before.  The fifth question is whether she could do other work.  If she could do either of

those two things, she'd be found not disabled.  If she couldn't do those two things, she

would be found disabled.  Do you understand what I just said?

Ans:    Uh-huh.

ALJ:    Does that raise any other questions for you?

Ans:    No.  I believe I already understood that.

9

Tr. 429-430.  The ALJ further advised McWhorter she could ask "any questions as we're going along . . . ."  Tr. 430.  Moreover, McWhorter is an intelligent and articulate individual with at least two years of college education.[2]  A review of the administrative hearing transcript does not support her allegations that she did not understand what the hearing would entail.  McWhorter was fully informed of her right to representation and made an informed decision to represent herself.  Accordingly, McWhorter's contention that the ALJ did not adequately advise her of her right to representation is without merit.

**D.  Development of the Record Regarding McWhorter's Nonsevere Mental Impairment**

McWhorter contends the ALJ erred when he found she did not have a severe mental impairment and erred when he failed to develop the record regarding her mental impairment.  McWhorter also contends the ALJ should have ordered "a full psychological evaluation."  Pl.'s Mem. in Support of Mot. to Reverse at 6.

The ALJ has broad latitude in determining whether to order a consultative examination.  *See Diaz*, 898 F.2d at 778.  Consultative examinations are necessary only to resolve conflicts in the medical evidence or to secure additional evidence needed to support a decision.  *See* 404.1519a & 416.919a*; see Winslow v. Apfel*, No. 97-2123, 1998 WL 45495 at *3 (10th Cir. Feb. 5, 1998)(unpublished opinion).

In his decision, the ALJ noted:

> The claimant has also alleged depression and post-traumatic stress disorder.  First, I note that the evidence does not support a finding that the claimant suffers from post-traumatic stress disorder as a medically determinable impairment.  While this diagnosis has been suggested by

---

[2] McWhorter's Full Scale IQ placed her at the 90th percentile for the general population. William Trueblood, Ph.D., opined McWhorter's results indicated her true Full Scale IQ was either in the Superior range or the High Average range of intellectual functioning.  Tr. 331.

her counselor, the claimant has never been in formal psychiatric treatment and has never been diagnosed with this disorder by a medically acceptable psychiatric source. Therefore, the record is insufficient to establish this alleged disorder as a medically determinable impairment. The claimant's depression has been diagnosed as dysthymia, specifically, as a longstanding mild depression. This diagnosis was made by William Trueblood, Ph.D., who evaluated the claimant on June 20, 2005 (Exhibit 11F). He noted that the claimant had many physical complaints and reported a history of significant childhood trauma and abuse extending into her adult relationships. She reported having seen Diana Person, a counselor, for three months on a weekly basis, and that this was very helpful. On IQ testing, Dr. Trueblood found that she scored in the superior to high-average range, but that her responses on the Personality Assessment Inventory suggests that psychological factors are the primary cause of her physical complaints. The claimant also admitted that she had been abusing alcohol for about six months, which warranted a diagnosis of alcohol abuse. His findings did not warrant a diagnosis of depression or post-traumatic stress disorder. Finally, Dr. Trueblood opined that the claimant would benefit from continued counseling.

The treatment notes of Diana Person, whom the claimant met with for supportive therapy over a three-month period beginning in January of 2003, indicate that the claimant exhibited "histrionic traits" and complained of feeling depressed (Exhibits 2F, 19F). In a note dated February 12, 2003, Ms. Person stated that "Katherine is able to maintain a good functional level without psychiatric medications. She is working hard in therapy . . . as a result her depression has lowered considerably" (Exhibit 2F). The claimant also saw Leanne Latterell for supportive counseling at The Women's Resource Center of Central Oregon once a month from May to October of 2005, but his was very superficial contact and no diagnoses were made (Exhibit 17F). On July 12, 2005, Paul Rethinger, Ph.D., reviewed the record on behalf of the Disability Determination Service (Exhibit 12F). He agreed that the claimant was not suffering from a severe mental impairment, finding only mild limitations in her ability to perform activities of daily living and mild interference with her social functioning. The claimant does not have a severe mental impairment.

Tr. 23.

Based on the record, there was no need to further develop the record because sufficient information existed for the ALJ to make his disability determination. On February 12, 2003, Diana Person, LLPC, diagnosed McWhorter with "Posttraumatic Stress Disorder and Depressive Disorder (PTSD) (mild to severe)." Tr. 281. As the ALJ noted, Ms. Person is not considered a medically acceptable psychiatric source. Ms. Person also indicated McWhorter's "PTSD had

gone untreated most of her life." *Id.*  Significantly, Ms. Person also noted McWhorter was "able

to maintain a good functional level without psychiatric medications."[3] *Id.*

> Dr. Trueblood, a psychologist, also evaluated McWhorter and noted in pertinent part:

> Evaluation of personality functioning and emotional status via the client's completion of the Personality Assessment Inventory (PAI) yields results that did involve some inconsistent responding to similar items.  This could affect the results and thus the following description/hypotheses should be viewed cautiously. [   ]Depression appears to be relatively mild or transient.  The results suggest that the client occasionally experiences, or experiences to a mild degree, maladaptive behavior patterns aimed at controlling anxiety.  The client's interpersonal style is likely to be warm, friendly, and sympathetic.  She is likely to be uncomfortable with interpersonal confrontation and conflict.

> **Conclusions**.  Psychological evaluation of Catherine McWhorter yields information that raises the possibility of diagnosis of Post Traumatic Stress Disorder.  The client's report does reflect history of traumas that would plausibly cause PTSD.  Also, she appears to experience flashbacks, hypervigilance, and exaggerated startle response.  There are, thus, elements of PTSD but it is not clear that all of the criteria are met to make this diagnosis.  I do not see clear indications of effects on social functioning and relationships.  Also note that the PAI results do not support diagnosis of PTSD.

> Depression appears to be long-term, consistent with Dysthymia.  Current status does not appear to meet the criteria for diagnosing a Major Depressive Episode.  There is no suicidal ideation, no strong worthlessness or guilt, no substantial recent weight change, no apparent concentration disturbance, and no clear sleep disturbance.

Tr. 331 (emphasis added).  On June 20, 2005, Paul Rethinger, Ph.D., a psychologist and agency

consultant, reviewed the record and completed a Psychiatric Review Technique form.  Tr. 333-

345.  After reviewing the record, Dr. Rethinger found McWhorter was **mildly** restricted in her

activities of daily living, had **mild** difficulties in maintaining social functioning, had **no** difficulties

---

[3]  McWhorter's testimony at the administrative hearing, supports Ms. Person's assessment regarding McWhorter's ability to maintain a good functional level without psychiatric medications or treatment.  McWhorter testified: "[B]efore the accident in '99, I worked five lunches and four night a week.  I went to work at 10:00 in the morning and I didn't get off work until midnight with an hour break . . . ."  Tr. 456.

in maintaining concentration, persistence, or pace, and had **no** episodes of decompensation.  Tr.

343.  Dr. Rethinger opined McWhorter's mental impairments were not severe.

Under the regulations, State agency expert opinions "must be treated as expert opinion

evidence of a nonexamining source."  *See* SSR 96-6p, 1996 WL 374180, at *1.  Like opinions by

nontreating sources, an ALJ "may not ignore these opinions and must explain the weight given to

these opinions in their decisions."  *Id.*  However, "the opinions of State agency medical and

psychological consultants . . . can be given weight only insofar as they are supported by evidence

in the case record . . . ."  *Id.* at *2.  Notably, "[i]n appropriate circumstances, opinions from State

agency medical and psychological consultants . . . may be entitled to greater weight than the

opinions of treating or examining sources."  *Id.* at *3.  This may occur where the state agency

consultant's opinion "is based on a review of a complete case record that includes a medical

report from a specialist in the individual's particular impairment which provides more detailed and

comprehensive information than what was available to the individual's treating source."  *Id.*  In

this case, evidence in the record supports Dr. Rethinger's opinion.  The ALJ also accorded Dr.

Rethinger's opinion the proper weight.

Moreover, "the operative question for disability benefits under the Act is whether

[p]laintiff experiences functional limitations due to her impairments."  *Gardner-Renfro v. Apfel*,

No. 00-6077, 2000 WL 1846220, at *3 (10th Cir. Dec. 18, 2000)(unpublished opinion).

Regardless of whether McWhorter could have been diagnosed with a particular mental

impairment, none of the psychologists or counselors found McWhorter to have functional

impairments which precluded the performance of all work during the relevant period. [4]  Under these circumstance, the ALJ was not required to seek further opinions or consultative examinations.

Finally, because an impairment is severe only if it significantly limits a claimant's mental or physical ability to perform basic work activities, the ALJ's finding that McWhorter did not have a severe mental impairment is supported by substantial evidence.

**E.  RFC Determination**

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and

---

[4]  McWhorter provided the following work history to Dr. Trueblood:

[Her] most recent job was from July 2004 until September 2004 as a waitress at the Hearts Café. The job ended because she had to move farther away from the café, for some reason. She actually did work for three days at Karen's as a waitress and dishwasher after that but that caused problems with her wrist and the employer dismissed her when she came to work with a brace.  After that, she had been hired at Sherry's Restaurant but she broke her wrists again before that job started.  Before that, she worked at a baker for six weeks until it closed.  She worked at the Log Cabin, busing tables, from August until December 2002. She quit because the physical demands were too much and she was doing everyone's work. Her longest job was for approximately three years as a bookkeeper and secretary in the late 1980s for a general contracting firm.  She says they loved her so much that they did hire her twice and they constantly were trying to get her to return there.

Tr. 329.  McWhorter never mentioned leaving a job due to a mental impairment.

continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.*

In his decision, the ALJ cited extensively to the record. The ALJ found McWhorter had "a history of left wrist injuries with closed reduction and a history of a torn medial meniscus of the right knee with arthroscopic repair, impairments that [were] "severe' within the meaning of the Regulations but not "severe" enough to meet or medically equal (either singly or in combination) one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." Tr. 24. In determining McWhorter's RFC, the ALJ considered "all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." *Id.* After reviewing her medical history (Tr. 24), noting her complaints (Tr. 25), and considering the opinions of the physicians and psychologists who reviewed the record (*Id.*), the ALJ determined McWhorter retained the following RFC:

> [T]o lift and carry up to ten pounds frequently and twenty pound occasionally; and to sit, stand and walk at least six hours each in an average, eight-hour work day. She is limited to occasional ladder climbing and scaffold use, as well as the performance of other postural activities such as bending and stooping. She should be limited to work environments where she could alternate sitting and standing or change positions as needed and should only occasionally perform overhead reaching with her upper extremities.

Tr. 25-26.[5]   Having determined McWhorter's RFC, the ALJ asked the vocational expert (VE) whether McWhorter could perform any of her past relevant work.  The VE testified McWhorter "could return to her past relevant work as a secretary, both as she previously performed this job and as this job is generally performed in the national economy" but that McWhorter's "other past work [was] precluded by her residual functional capacity."  Tr. 27.  However, the VE then identified "other jobs to which [McWhorter] could make a successful vocational adjustment."  *Id.* The VE testified McWhorter could perform the following jobs: garment sorter, which is light and unskilled (DOT code 222.687-014) (413,153 such jobs nationally and 5,327 in Oregon); gatekeeper, which is light and semi-skilled (DOT code 372.667-030)(792,675 such jobs nationally and 7,763 in Oregon); and ticket taker, which is light and unskilled (DOT code 344.667-010)(57,659 jobs nationally and 469 in Oregon). Tr. 27.

The ALJ concurred with the VE's testimony and found McWhorter was not disabled.  The ALJ also found that "[e]ven if [McWhorter] had limitations which she asserted, from sitting over 10 minutes at a time, walking more than 30 minutes at a time, lifting more than a few pounds with the left upper extremity, reading more than short periods at ta time, driving in the dare, being in a setting where she might be jossled inadvertently, with difficulty turning the let wrist and difficulty maintaining balance without use of a cane," based on the VE's testimony, she "could still perform the work as a garment sorter and gatekeeper."  *Id.*

McWhorter contends Dr. Dodson's physical capacities checklist indicates she could not perform pushing or pulling with the left upper extremity, and she could not perform frequent

---

[5]  The ALJ also considered McWhorter's "statements made at the hearing and in disability reports submitted in conjunction with her application, as well as any statements made by third persons on her behalf."  Tr. 26.

reaching above shoulder level on the right.   A review of Dr. Dodson's Physical Capabilities

Check List indicates Dr. Dodson opined McWhorter could not use her left upper extremity for

**repetitive** pushing/pulling not that she could not perform any pushing or pulling with the left

upper extremity as she asserts.  Tr. 287.  McWhorter's contention that Dr. Dodson opined she

could not perform frequent reaching above shoulder level on the right is also not supported by Dr.

Dodson's Physical Capabilities Check List.  To the contrary, Dr. Dodson opined McWhorter was

able to reach above the shoulder **frequently** on the right.  *Id*.  Accordingly, Dr. Dodson's

Physical Capabilities Check List supports the ALJ's RFC.

McWhorter also relies on her testimony at the administrative hearing to refute the ALJ's

RFC determination.  McWhorter contends she testified she could  "last  only about 2 hours in the

work environment."  Pl.'s Mem. in Support of Mot. to Reverse at 10.  However, the ALJ found

McWhorter was not "fully credible" and affirmatively linked his credibility finding to substantial

evidence.  Accordingly, the ALJ did not have to rely on McWhorter's statement in determining

her RFC.

Additionally, in determining McWhorter's RFC, the ALJ cited to a report submitted by

Delmar L. Greenleaf, M.D., an Oregon physician who evaluated McWhorter for the Disability

Determination Services of the Department of Human Services in the State of Oregon.  Tr. 313-

317. Dr. Greenleaf performed a thorough examination and opined as follows:

> I felt patient's subjective complaints of pain were not consistent with her objective findings
> and pain behavior interfered with accuracy of assessment.   Based on medical records
> available, I think the patient can stand and walk two hours at a time for an eight-hour day.
> She could sit for two hours at a time and work an eight-hour day.  Lifting and carrying should
> be limited to 15 pounds on infrequent basis based on her subjective complaint of pain of her
> wrists.  The patient can hear and speak.  The patient can handle small objects with her fingers.

It should be noted when I attempted to have her perform intrinsic muscle, ulnar and median nerve motor function of her fingers, she would not fully extend her interphalangeal joints. However, later, she manipulated her hand entirely normal with her right hand indicating inconsistent nonphysiologic problems. The patient can travel on private and public transportation vehicles.

Tr. 316-317.

McWhorter also contends the ALJ should have applied Social Security Ruling 83-12 which states in pertinent part:

1. Alternate Sitting and Standing

In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferrng work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12, 1983 WL 31253 at *4 (emphasis added). Although the ALJ consulted with a VE, McWhorter contends the ALJ "did not quantify the issue" because he only stated in his hypothetical to the VE that she "needs an opportunity to change position." Pl.'s Mem. in Support of Mot. to Reverse at 11 (citing to Tr. 459). McWhorter claims this was insufficient and grounds for a remand. The Court disagrees.

18

As the Commissioner points out, the VE testified that work as a garment sorter and gate keeper allowed the worker to "shift or change positions as you would need to, you could take a stretch with those jobs . . . ."  Tr. 463.   The VE emphasized the garment sorter "would have that opportunity to move around and sit and stand at will."  Tr. 464.  Thus, the VE's testimony indicates there was work available to McWhorter that allowed her to change positions and sit and stand at will.  The VE's testimony that McWhorter could perform the jobs of garment sorter, ticket taker and gatekeeper constitutes substantial evidence supporting the ALJ's decision.

Finally, McWhorter contends the ALJ erred when he adopted the VE's testimony that she could perform her past relevant work as a secretary.  McWhorter states the VE eliminated the secretarial work after the ALJ added to his hypothetical question the impairment of difficulty manipulating with the left wrist.  McWhorter claims this impairment is supported by the record and thus the ALJ's failure to include it in the question to the VE was reversible error.  Because the ALJ made alternative step five findings that supports his ultimate conclusion that McWhorter is not disabled, the Court will affirm the ALJ's decision.

**F.  Conclusion**

It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994).  The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied. After such review, the Court is satisfied that substantial evidence supports the ALJ's finding of nondisability.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**

20